ONEBEACON INSURANCE GROUP,    :
a/s/o DEKALB CENTRAL CORPORATION  :
and HARTFORD CASUALTY INSURANCE  :
COMPANY, a/s/o RPFJ SHELTON, LLC,   :
     Plaintiffs,                :
                              :
v.                          :        CIVIL ACTION NO.
                              :        3:08-cv-1167 (VLB)
TYLO AB,                 :
     Defendant.              :        August 4, 2010

## MEMORANDUM OF DECISION DENYING
## DEFENDANT'S MOTION TO DISMISS [Doc. #31]

This is a product liability and negligence action stemming from a sauna fire at a health club in Shelton, CT. The Defendant, Tylö AB ("Tylö"), a Swedish corporation, has moved to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(2), arguing that this Court lacks personal jurisdiction over Tylö. The Plaintiffs oppose this motion and, in the alternative, request a transfer of venue to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1631 if the Court finds that it lacks personal jurisdiction. Two issues are before the Court: first, whether the Connecticut long-arm statute, Conn. Gen. Stat. § 33-929, permits the exercise of personal jurisdiction over Tylö; and second, whether Tylö has sufficient minimum contacts in Connecticut to satisfy constitutional notions of justice and fair play consistent with the Due Process Clause of the Fourteenth Amendment of the United States Constitution. For the reasons set forth below, Tylö's motion to dismiss for lack of personal jurisdiction [Doc. #31] is DENIED.

# I.  FACTS

The following facts are taken from the Complaint [Doc. #1], Tylö's motion to dismiss [Doc. #31], the Plaintiffs' memorandum in opposition to the motion to dismiss [Doc. #33], and supporting affidavits and exhibits.  On November 15, 2006, a sauna fire occurred at the Valley Fitness II health club ("the club") in Shelton, CT.  The fire was ignited by a towel left on a sauna heater by a club patron, causing damage to the premises in excess of $75,000.  Tylö manufactured the sauna heater in question.

RPFJ Shelton LLC ("RPFJ") operated the club, and DeKalb Central Corporation ("DeKalb") owned and leased the premises to RPFJ.  RPFJ and DeKalb each insured the premises by policies issued by The Hartford Insurance Company ("The Hartford") and OneBeacon Insurance Group ("OneBeacon"), respectively.  The Hartford and OneBeacon received claims from DeKalb and RPFJ and paid amounts in excess of $75,000 for the resulting damage.  Hartford and OneBeacon are subrogated to the rights of their insureds to the extent of their payments.

OneBeacon is a Delaware corporation with its principal place of business in Massachusetts and The Hartford is an Indiana corporation with its principal place of business in Connecticut.  Tylö is a Swedish corporation.  Tylö did not directly sell the sauna heater, manufactured in 1990, to RPFJ or DeKalb.

Tylö does not make direct sales in the United States, nor does it have a place of business in the United States.  In addition, Tylö does not have any

agents authorized to accept service of process in the United States, does not

have bank accounts or personal property in the United States, does not directly

advertise in the United States, and does not have any tax obligations in the

United States. Tylö exports less than 2% of its total manufacturing output to

customers in the United States. Tylö does, however, maintain a website in

English, which the company claims is not for the benefit of United States

customers, but for customers from other English-speaking countries. The

website includes language indicating a desire to sell products internationally, and

includes links for two distributors in the United States through which customers

can order Tylö's products - Penn Sauna Corp. ("Penn Sauna"), located in Oxford,

Pennsylvania, and Airmist Sauna & Steam ("Airmist"), located in Minnesota.

Tylö's representative, Magnus Gustavsson, testified during his deposition that

Tylö also sells its products in the United States through a third distributor that is

not listed on the website - Nordic Sauna, located in California. See Pl. Ex. A, Doc.

#33-2, at 66-67. In addition, Tylö maintains a registered trademark in the United

States and, as Gustavsson admitted, obtained an Underwriter Laboratories listing

approval with the expectation that its products would be sold in the United

States. Id. at 57-58.

Tylö and Penn Sauna have maintained a business relationship since 1991.

Although they never entered a written contract, Penn Sauna has distributed

Tylö's products to customers in the northeastern region of the United States,

which includes Connecticut, for one-and-a-half decades. Penn Sauna's average

3

annual Tylö product sales per year is $300,000.  Penn Sauna sells Tylö's sauna heaters to individual consumers and retailers or dealers in the northeastern United States, including AA Prof. Sauna, a Connecticut company.  However, it is not clear how the particular sauna heater on which this lawsuit is based made its way into Connecticut.  Airmist sells Tylö products to customers in the midwestern United States, and Nordic Sauna sells Tylö products to customers in the western United States.

In furtherance of their business relationship, Tylö has participated in multiple meetings with Penn Sauna during which Tylö expressed a desire to expand sales in the United States and provided training to Penn Sauna representatives for the installation, maintenance, and repair of Tylö products.  However, none of these meetings occurred in Connecticut, nor has there been any indication that the discussions were focused specifically on sales in Connecticut.  In addition, Tylö supplies Penn Sauna and its other distributors with marketing materials such as product descriptions, photographs, specifications, and installation instructions, and asks its distributors to show its products at trade fairs in the United States.

## II. STANDARD OF REVIEW

To successfully defeat a Federal Rules of Civil Procedure 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the Court has personal jurisdiction over the defendant.  Metropolitan Life Insurance Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir.1996).  "At this

4

stage of the proceedings, the plaintiff must make out only a <u>prima facie</u> showing of personal jurisdiction through their own affidavits and supporting materials and all affidavits and pleadings must be construed in the plaintiff's favor." <u>Edberg v. Neogen Corp.</u>, 17 F. Supp. 2d 104, 110 (D. Conn. 1998) (citing <u>CutCo Industries, Inc. v. Naughton</u>, 806 F.2d 361, 365 (2d Cir. 1986)). In addition, the Court "must resolve all doubts in favor of the plaintiffs, regardless of controverting evidence submitted by the defendant." <u>Criscitelli v. Proline Boats</u>, 3:03 CV 1522(CFD), 2004 WL 1964507, at *2 (D. Conn. Aug. 31, 2004).

"[T]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits . . . ." <u>Arrowsmith v. United Press Int'l</u>, 320 F.2d 219, 223 (2d Cir. 1963) (in banc); <u>accord</u> <u>Hoffritz for Cutlery, Inc. v. Amajac, Ltd.</u>, 763 F.2d 55, 57 (2d Cir. 1985). Accordingly, this Court applies the law of the State of Connecticut. In order to ascertain whether a court has personal jurisdiction, Connecticut applies a two-step analysis. A court must first look to the forum State's long-arm statute and determine whether the statute reaches the foreign corporation. If the long-arm statute authorizes personal jurisdiction over a defendant, the court must then decide whether the exercise of jurisdiction over that party offends due process. <u>Bensmiller v. E.I. Dupont de Nemours & Co.</u>, 47 F.3d 79, 81 (2d Cir. 1995) (citing <u>Greene v. Sha-Na-Na</u>, 637 F.Supp. 591, 59 (D. Conn. 1986)).

## III. ANALYSIS

Tylö argues that it is not subject to personal jurisdiction in Connecticut for two reasons; first, the Connecticut long-arm statute does not authorize jurisdiction over Tylö; and second, the exercise of jurisdiction over Tylö would offend constitutional notions of due process. The Plaintiffs make the converse arguments, claiming that Connecticut has statutory long-arm jurisdiction over Tylö and that Tylö had sufficient "minimum contacts" with Connecticut such that the exercise of jurisdiction in this case would comport with due process.

### A. Connecticut's Long-Arm Statute

Connecticut's long-arm statute states, in relevant part:

Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state; (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.[1]

---

[1] The Plaintiffs fail to contest Tylö's argument that it does not "transact business" in Connecticut under Conn. Gen. Stat. § 33-929(e). Since the Plaintiffs have conceded that the Court does not have jurisdiction over the Defendant under Conn. Gen. Stat. § 33-929(e), the Court will not analyze the applicability of this subsection.

Conn. Gen. Stat. § 33-929(f).  As the Plaintiffs concede, subsections (1) and (2) are irrelevant to this case.  Therefore, in resolving the instant dispute, the Court must determine the applicability of subsections (3) and (4).

The purpose of Conn. Gen. Stat. § 33-929(f)(3) is to enable Connecticut courts to exercise jurisdiction over manufacturers in product liability suits which did not themselves directly ship their products to Connecticut.  See Buckley v. New York Post Corp., 373 F.2d 175, 177-78 (2d Cir. 1967).  In assessing whether this provision applies, the Court must consider on a case-by-case basis the "totality" of the foreign defendant's conduct and the foreign defendant's connection with Connecticut.  Tomra of North America, Inc. v. Environmental Products Corp., 4 F. Supp. 2d 90, 93 (D. Conn. 1998).  Upon consideration of these factors, the Court must determine whether the foreign defendant may have reasonably expected to be haled into court in Connecticut.  Id.  In other words, "in applying §33-929(f)(3), the Connecticut courts have held that if the defendant knew or reasonably should have known that its product would find its way into the stream of commerce in Connecticut, then it would not be unreasonable for it to expect to defend an action in Connecticut."  Id. at 95-96.

The Connecticut Superior Court's decision in Noon v. Calley & Currier Co., No. CV 93-521514S, 1995 WL 118387 (Conn. Super. Ct. 1995) is instructive with respect to the scope of Conn. Gen. Stat. § 33-929(f)(3).  In Noon, the Connecticut Superior Court held that a Korean company whose only connection with Connecticut was that it used a distributor whom it knew conducted business

7

nationally, throughout 90% of the United States, had a reasonable expectation that its product would be sold in Connecticut.  The Court explained that "Korea Hinomoto may not have actually known that its bolts ended up in Connecticut but it is a reasonable inference that a sale of their bolts to [a distributor] that resells them to 45 states including directly in Connecticut will generally result in the sale - or at least use - of their bolts in Connecticut."  Id. at *3.  The Superior Court based this inference on the fact that the Korean manufacturer knew that its products were being distributed in the United States, that 5.8% of its sales were through third parties, and that it had a business relationship with the particular distributor at issue for the past fifteen years.  Id.  Thus, the Superior Court ruled that where a foreign company engages in a relationship with a United States distributor for several years and knows that the distributor distributes widely across the nation, it is not unreasonable to find that the foreign company should have had a reasonable expectation that its products would be sold or used in Connecticut.

Here, as in Noon, Tylö had a relationship with Penn Sauna for fifteen years whereby Penn Sauna distributed its products to the northeastern United States, a region which includes Connecticut, and Tylö provided Penn Sauna with marketing materials to facilitate those sales.  The two parties held meetings in which they discussed expanding sales in the United States.  Tylö also trained Penn Sauna representatives to install, maintain, and repair its products.  Where, as here, a foreign company engages in a relationship with a distributor in the

United States for fifteen years and expresses an intent and strategy to distribute its products to a particular region, it is not unreasonable to hold that the foreign company should have reasonably expected that its products would be sold or used in any particular State within that region. In addition, Tylö had an English-language website which included language demonstrating an intent that its products would be sold internationally, and which directed prospective customers to Penn Sauna and another United States distributor operating in a different region. Tylö obtained the proper UL listing approval and trademark registration to protect its sales in the United States. Tylö also supplied Penn Sauna with marketing materials, including product descriptions, photographs, specifications, and installation instructions. Based upon these facts, the Court holds that Tylö should have reasonably expected that its products would be sold or used in Connecticut. Therefore, long-arm jurisdiction exists over Tylö pursuant to Conn. Gen. Stat. § 33-929(f)(3).

Given the Court's finding that long-arm jurisdiction exists over Tylö pursuant to Conn. Gen. Stat. § 33-929(f)(3), the Court need not address the parties' arguments related to the applicability of Conn. Gen. Stat. § 33-929(f)(4). This subsections grants jurisdiction where a foreign defendant's conduct arises "out of tortious conduct in this state . . . ." The Court notes, however, that it does not appear that this subsection would apply in the present action. To fall within the scope of § 33-292(f)(4), "a defendant's tortious conduct [must] be directly and expressly targeted at the forum state." <u>Uniroyal Chem. Co. v. Drexel Chem. Co.</u>,

931 F. Supp. 132, 140 (D. Conn. 1996). As the Second Circuit has observed, to hold otherwise would "obliterate the longstanding distinction between long-arm statutes that reach tortious conduct in a given state and those that reach conduct which causes tortious injury in the state by actions outside the state." General Star Indem. Co. v. Anheuser-Busch Co., No. 99-7004, 1999 WL 1024708, at *1 (2d Cir. Nov. 9, 1999); see also Bross Utils. Serv. Corp. v. Aboubshait, 489 F. Supp. 1366, 1372-73 & n.35 (D. Conn. 1980) (noting that Connecticut's long-arm statute subjects non-resident individuals to jurisdiction in the State for tortious acts outside the State having effects in the State but contains no similar provisions for corporations, and relying upon this omission to reject a broad reading of the "tortious conduct in this state" language). Here, the tortious conduct at issue is the allegedly negligent manufacture of the sauna heater by Tylö, which ostensibly occurred in Sweden. Tylö then distributed the allegedly defective sauna heater to a distributor in the United States, but lacked specific knowledge as to whom the distributor ultimately sold the sauna heater. Therefore, it cannot be said that Tylö's allegedly tortious conduct was "directly and expressly targeted" at Connecticut so as to fall within the purview of Conn. Gen. Stat. § 33-929(f)(4).

### B. Due Process Inquiry

Having found that jurisdiction may be exercised over Tylö under Connecticut's long-arm statute, the Court must next determine whether the exercise of jurisdiction in this case would comport with due process. See In re Helicopter Crash near Wendle Creek, 485 F. Supp. 2d 47, 51 (D. Conn. 2007). "The

due process clause of the Fourteenth Amendment permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  <u>Kernan v. Kurz-Hastings</u>, 175 F.3d 236, 242 (2d Cir. 1999) (citing <u>Calder v. Jones</u>, 465 U.S. 783, 788 (1984)).

The Supreme Court has established a two-pronged test for determining whether a court has personal jurisdiction over a non-resident corporation.  <u>See International Shoe Co. v. Washington</u>, 362 U.S. 310, 314 (1945)).  First, the corporation must have certain "minimum contacts" or ties with the forum State. <u>Id.</u>  Second, it must not "offend traditional notions of fair play and substantial justice" to subject the corporation to litigation in the forum State.  <u>Id.</u>

There are two types of situations in which a court may exercise jurisdiction over a foreign defendant, and the analysis differs depending upon which type of situation is being considered.  The first situation is when a court exercises personal jurisdiction over a foreign defendant in a suit "arising out of or related to the defendant's contacts with the forum, which is referred to as "specific jurisdiction."  <u>Helicopteros Nacionales v. Hall</u>, 466 U.S. 408, 414 n.8 (1984).  By contrast, the second situation occurs when a court exercises personal jurisdiction over a foreign defendant in an action that does not arise out of or relate to the defendant's contacts with the forum, which is referred to as "general jurisdiction."  <u>Id.</u> at 414 n.9.  The Plaintiffs do not argue that general jurisdiction

applies in this case. Accordingly, the Court now proceeds to analyze whether it may assert specific jurisdiction over Tylö.

In accordance with the prevailing standard, the Court must first address whether minimum contacts exist between Tylö and Connecticut, which requires consideration of "the relationship among the defendant, the forum, and the litigation." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984). Critically, in order to establish specific jurisdiction, the plaintiff "must . . . show that [the defendant] 'purposefully availed' [itself] of the privilege of doing business in [the forum State] and that [the defendant] could foresee being 'haled into court' there." Kernan, 175 F.3d at 242-43 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

If the plaintiff demonstrates that minimum contacts exist, the Court must also consider whether the assertion of jurisdiction comports with 'traditional notions of fair play and substantial justice' - that is, whether it is reasonable under the circumstances of a particular case." Kernan, 175 F.3d at 243 (quoting Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996)).

Applying these standards in the present case, the Court concludes that Tylö has sufficient minimum contacts with Connecticut to support the exercise of jurisdiction and that the assertion of jurisdiction is reasonable under the circumstances.

1.  <u>**Minimum Contacts**</u>

In their opposition to the motion to dismiss, the Plaintiffs rely upon a "stream of commerce" theory in an attempt to establish that Tylö "purposefully availed" itself of the privilege of doing business in Connecticut and thus has sufficient "minimum contacts" with Connecticut.  The United States Supreme Court has stated that a forum State "does not exceed its power under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."  <u>World-Wide Volkswagen Corp.</u>, 444 U.S. at 297-98.  As the Supreme Court explained, if the sale of a product of a manufacturer or distributor "is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has been the source of injury to its owners or to others."  <u>Id.</u>

Subsequently, in <u>Asahi Metal Industry Co. v. Superior Court</u>, 480 U.S. 102, 112 (1987), a plurality of the United States Supreme Court expressed a more restrictive view of the "stream of commerce" standard established in <u>World Wide Volkswagen</u>, stating that "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state."  However, as the plurality further explained, "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum

13

State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Id. The concurrence rejected the plurality's more restrictive view, and instead endorsed a version of the "stream of commerce" standard in product liability cases that would allow the exercise of jurisdiction over any manufacturer which places its products in the "stream of commerce" and is aware that its product may be sold in the forum State. Id. at 116-17.

The plurality and concurring opinions of Asahi are not controlling, however, because each failed to garner a majority. Subsequently, in Kernan v. Kurz-Hastings, the Second Circuit discussed the "stream of commerce" doctrine, but declined to adopt either view espoused in Asahi because the conduct in that case met the standard advocated by both the plurality opinion and the concurrence. 175 F.3d at 243. The facts presented in Kernan are instructive. The plaintiff in that case, a New York resident, was injured while operating a hot stamping press. Id. at 239. She brought a product liability action in New York against the Pennsylvania distributor that sold the press to her employer. Id. The distributor removed the case to federal court, and subsequently filed a third-party complaint for contribution and indemnification against the employer and against the Japanese manufacturer of the press in question that had sold and shipped the press to the distributor. Id. The manufacturer was not licensed or registered

14

to do business in New York, never directly transacted or solicited business in New York, and never provided any services nor entered into any contract in New York.  **Id.**  The manufacturer had an oral agreement with the distributor to manufacture the press, but had no knowledge of what would become of the press other than the general knowledge that the distributor would resell it somewhere in the United States.  **Id.**  In addition, the manufacturer had a contract with the distributor granting the distributor the exclusive right to sell and promote its products in North America and any other country with the exception of 17 specified Asian countries.  **Id.**  The sales agreement also provided for the exchange of information for the purposes of developing or producing new machines and for either party to notify the other three months in advance of revising prices.  **Id.**  Pursuant to that agreement, between 1976 and 1981, the distributor sold 168 presses manufactured by the manufacturer, including the press at issue which had been sold to the plaintiff's employer in 1981.  **Id.**  The record did not reveal where the remaining presses were sold.  **Id.**  The manufacturer moved to dismiss for lack of personal jurisdiction.  The district court denied the manufacturer's motion to dismiss, and the manufacturer appealed.

After holding that New York's long-arm statute permitted the exercise of jurisdiction over the manufacturer, the Second Circuit proceeded to analyze whether specific jurisdiction could be exercised consistent with the Due Process Clause.  The Second Circuit first concluded that there were sufficient minimum

contacts between the manufacturer and the forum even under the more restrictive version of the "stream of commerce" doctrine set forth by the plurality in Asahi. Id. at 244. The Second Circuit reasoned that the "exclusive sales rights" agreement between the Japanese manufacturer and the Pennsylvania distributor "constitutes the type of purposeful action sufficient to support a finding of minimum contacts." Id. The Second Circuit explained that the agreement not only gave the distributor the right to sell the manufacturer's products anywhere outside of seventeen specified Asian countries, but also provided for the exchange of information relevant to product development as well as pricing information. Id. at 242. In addition, the manufacturer had an oral agreement to manufacture machines for sale by the distributor, and the manufacturer had "general knowledge" that the distributor would resell the machines throughout the United States. Id. The Second Circuit further concluded that the exercise of jurisdiction over the manufacturer would not offend "traditional notions of fair play and substantial justice," and therefore affirmed the district court's denial of the manufacturer's motion to dismiss. Id. at 245.

The Court finds the facts of the instant case sufficiently analogous to Kernan so as to support the conclusion that Tylö had minimum contacts with Connecticut under either version of the "stream of commerce" doctrine enunciated in Asahi. Here, as in Kernan, Tylö, the manufacturer of the allegedly defective product, never directly transacted or solicited business in the forum State. Instead, Tylö sells its products in the United States through three

distributors, including a distributor in Pennsylvania, Penn Sauna, which sells to individual consumers and retailers in the northeastern United States, a region that includes Connecticut.  Also as in <u>Kernan</u>, Tylö had no specific knowledge of what would become of its products once it provided them to Penn Sauna, other than the general knowledge that Penn Sauna would resell them somewhere in the northeastern United States.  Although Tylö did not have a written contract with Penn Sauna as the manufacturer had with the distributor in <u>Kernan</u>, the Plaintiffs have presented evidence indicating that Tylö has had a longstanding business relationship with Penn Sauna, and that Tylö participated in multiple meetings with Penn Sauna during which Tylö expressed a desire to expand sales in the United States and provided training to Penn Sauna representatives for installation, maintenance, and repair of Tylö's products.  Tylö has also provided Penn Sauna with advertising on its website and marketing materials such as product descriptions, photographs, specifications, and installation instructions.  Penn Sauna, in turn, purposefully targets Connecticut through its website and marketing campaigns and, as the record reflects, has in fact made sales of Tylö's products in Connecticut.  Tylö's business relationship with Penn Sauna, pursuant to which Tylö has held meetings with Penn Sauna and provided Penn Sauna with marketing materials, training, and product information in order to expand sales in the northeastern United States, constitutes the type of "additional conduct" beyond merely placing a product in the stream of commerce that indicates an intent to serve the market in Connecticut as conceptualized by the <u>Asahi</u>

plurality's version of the "stream of commerce" doctrine. See Kernan, 175 F.3d at 244-45; see also Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 613 (8th Cir. 1994) (holding that court in Nebraska had jurisdiction over Japanese manufacturer under a "stream of commerce" theory based upon network of nine regional distributors that resold manufacturer's products in the midwestern United States, including Nebraska, even though manufacturer had no direct knowledge that its products would be sold in Nebraska). Therefore, construing the evidence in the Plaintiffs' favor, the Court concludes that Tylö had sufficient "minimum contacts" with Connecticut to support the exercise of specific jurisdiction.

## 2. Reasonableness

The Court next addresses whether the exercise of jurisdiction "comports with traditional notions of fair play and substantial justice." Kernan, 175 F.3d at 244. The "reasonableness" factors that the Court must consider are: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering social substantive policies." Id.

### a. Burden on the Defendant

First, there would be a substantial burden imposed on Tylö, a Swedish manufacturer, if it is forced to defend a suit in Connecticut. However, the Second

Circuit has noted that "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." <u>Metropolitan Life Ins. Co.</u>, 84 F.3d at 574. Therefore, while this factor weighs in favor of Tylö, it is not dispositive.

b. <u>Interests of the Forum</u>

Next, the Court finds that Connecticut has a strong interest in the dispute between the parties in this case. The property that was damaged as a result of the fire caused by the allegedly defective sauna heater is located in Connecticut, as are the Plaintiffs' insureds. Furthermore, there appears to be no dispute that Connecticut product liability and negligence law apply in this case. Therefore, this factor weighs in favor of the Plaintiffs. <u>See</u> <u>Kernan</u>, 175 F.3d at 244 (finding that New York had strong interest in case where person injured by allegedly defective product was a New York resident and there was no dispute that New York product liability and negligence law applied).

c. <u>Interests of the Plaintiffs in Obtaining Convenient and Effective Relief</u>

The Plaintiffs clearly have an interest in litigating this case in Connecticut. The allegedly defective sauna heater was located in Connecticut, the site of the health club fire. In addition, the Plaintiffs' insureds are located in Connecticut. Therefore, the Plaintiffs' witnesses and much of the evidence will be located in Connecticut. Furthermore, the alternatives to litigating this action in Connecticut would be either to transfer the case to Pennsylvania, a State with which it appears Tylö would have minimum contacts by virtue of its relationship with

Penn Sauna, or to dismiss this case entirely.  It would obviously be less efficient from the Plaintiffs' perspective to litigate this case in Pennsylvania.  Further, if the case is dismissed, the Plaintiffs would ostensibly be left without legal recourse in the United States, and would be forced to attempt to redress their loss in Sweden, which would impose a substantial burden on them.  Therefore, this factor weighs in favor of the Plaintiffs.

### d. Efficient Administration of Justice

In evaluating this factor the Court must "generally consider where witnesses and evidence are likely to be located."  Metropolitan Life, 84 F.3d at 574.  As discussed above, the allegedly defective sauna heater was located in Connecticut, the site of the health club fire.  Therefore, many of the witnesses and much of the evidence will be located in Connecticut.  While the design and manufacturing of the sauna heater presumably took place in Sweden, the evidence relating to those processes is likely to be largely documentary in nature.  See Kernan, 175 F.3d at 245 (noting that this factor weighed in favor of exercising jurisdiction because allegedly defective machine was located in New York and, while design and manufacturing processes took place in Japan, evidence relating to those processes was likely to be documentary in nature).  Furthermore, as noted previously, the alternatives to litigating this action in Connecticut would be either to transfer the case to Pennsylvania, a State with which it appears Tylö would have minimum contacts by virtue of its relationship with Penn Sauna, or to dismiss this case entirely.

The first option would be undesirable because Pennsylvania has far less of an interest in adjudicating this case than Connecticut, given that the injury occurred in Connecticut and the Plaintiffs' insureds are located in Connecticut. Further, requiring Tylö to litigate in Pennsylvania would be no less burdensome than requiring it to litigate in Connecticut. The second option would also obviously be undesirable from the Plaintiffs' perspective, as they would ostensibly be left without legal recourse in the United States, and would be forced to attempt to redress their loss in Sweden, which would impose a substantial burden on them. Therefore, this factor also weighs in favor of the Plaintiffs.

### e. Policy Arguments

"This factor requires [the Court] to consider the common interests of the several states in promoting substantive social policies." Id. at 575. The Plaintiffs claim that substantive social policy would be furthered by permitting this case to be heard in Connecticut because Tylö uses an east coast distributor to service the northeastern United States, a region which includes Connecticut. Tylö, on the other hand, argues that substantive social policy would be undermined if this case proceeds in Connecticut because it conducts its business overseas and has not made efforts to avail itself of the privileges of doing business in Connecticut. Therefore, the parties essentially reiterate the arguments they made with respect to the "purposeful availment" prong discussed above, and do not identify any independent substantive social policies that would be furthered or undermined

by permitting this case to go forward in Connecticut.  Accordingly, this factor does not weigh in either party's favor.

Thus, upon reviewing the five reasonableness factors, the Court finds that the first factor tips in Tylö's favor, whereas the second, third, and fourth factors weigh in favor of exercising jurisdiction.  On balance, therefore, the Court concludes that exercising jurisdiction over Tylö would not offend "traditional notions of fair play and substantial justice."  <u>Kernan</u>, 175 F.3d at 244.

## IV.  <u>CONCLUSION</u>

Based on the above reasoning, the Court concludes that it has personal jurisdiction over Tylö for purposes of this case.  Accordingly, Tylö's motion to dismiss [Doc. #31] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  August 4, 2010.